**CONNECTICUT LIMOUSINE SERVICE, INC., Plaintiff,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Trailways of New England, Inc., Arrow Line, Inc., the Connecticut Company, Connecticut-New York Airport Bus Co., Inc., George Kuss d/b/a Valley Transportation, Resort Bus Lines, Inc., and The Short Line of Connecticut, Inc., Intervenors.**

Civ. No. 12085.

United States District Court
D. Connecticut.

Feb. 16, 1968.

Palmer S. McGee, Jr. and Timothy P. Bodman, of Day, Berry & Howard, Hartford, Conn., for plaintiff.

Donald F. Turner, Asst. Atty. Gen., and John H. D. Wigger, Dept. of Justice, Washington, D. C., John O. Newman, U. S. Atty., Hartford, Conn., for the United States.

Robert W. Ginnane, Gen. Counsel, and Steven Kazan, Atty., Interstate Com-

merce Commission, Washington, D. C., for Interstate Commerce Commission.

James E. Wilson and Bruce E. Mitchell, Washington, D. C., Reubin Kaminsky, Hartford, Conn., for intervenor, Trailways of New England, Inc.

Thomas W. Murrett of Joseloff, Murrett & Knierim, Hartford, Conn., for intervenors, Arrow Line, Connecticut Co., Conn.-New York Airport Bus Co., George Kuss d/b/a Valley Transportation, Resort Bus Lines and The Short Line of Conn.

Before SMITH and ANDERSON, Circuit Judges, and BLUMENFELD, District Judge.

## MEMORANDUM OF DECISION

J. JOSEPH SMITH, Circuit Judge.

This is an action to set aside or annul an order of the Interstate Commerce Commission. This three-judge district court has jurisdiction under 28 U.S.C. § 1336 and 28 U.S.C. §§ 2321–2325.

Plaintiff Connecticut Limousine Service, Inc., by application filed September 29, 1965, sought a certificate of public convenience and necessity authorizing operation in interstate or foreign commerce as a common carrier by motor vehicle, over regular and irregular routes, transporting passengers and their baggage, generally between New Haven, Fairfield, Stratford, Waterbury, Derby, Bridgeport, Norwalk, Stamford, and Danbury, Connecticut, on the one hand, and, on the other, John F. Kennedy International Airport and LaGuardia Field Airport, New York, New York, and Newark Airport, Newark, New Jersey.

The effect of granting the application would be to remove from the outstanding certificates held by plaintiff a restriction limiting plaintiff to " * * * the transportation of not more than eleven passengers in any one vehicle, not including the driver thereof * * * "

Numerous motor carriers, most of them intervenors herein, opposed the granting of the application. Hearings were held in Hartford, Connecticut on March 31, April 1, June 29 and 30, 1966. The hearing examiner, in his report served November 9, 1966, recommended that the application be denied. The Commission, Operating Rights Review Board No. 3, adopted that recommendation by its decision and order entered on February 24, 1967, No. MC–123748 (Sub-No. 18); plaintiff's petition for reconsideration was denied by the Commission, Division 1, acting as an Appellate Division, by order adopting the hearing examiner's report, and dated June 16, 1967.

Plaintiff's president, Edward DiLauro, began operating between the New York Airports and New Haven and Fairfield, Connecticut in 1960, using three five-passenger vehicles on three round trips daily. He carried 275 passengers during his first month of operations. DiLauro received permanent authorization for that operation in the ICC's decision of February 27, 1961, Edward DiLauro Common Carrier Application, 84 M.C.C. 501. Subsequently the business was incorporated. As demand for the service increased, plaintiff obtained authority by a series of applications before the Commission to serve eighteen Connecticut towns and cities. At the time of the hearing, plaintiff was carrying more than 20,000 passengers per month; at present, plaintiff is carrying more than 35,000 passengers per month. (At least in part, the increase is due to plaintiff's acquisition of Brown's Connecticut Limousine Service, Inc., one of the carriers originally in opposition in the proceeding under review.)

Defendants claim that any increase in plaintiff's business since the hearing is outside the record and not properly before the court; plaintiff contends that since its acquisition of Brown was known to the ICC before its petition for reconsideration was denied, the increase may be considered. The reasoning by which the ICC denied plaintiff's application supports the result equally well whether the increase is considered or not, so that the question need not be decided here.

Plaintiff operated at the date of the hearing, 12 five-passenger, 3 eight-pas-

senger, 1 seven-passenger, and 55 eleven-passenger vehicles, and had 6 eleven-passenger limousines under construction. The basic operation is over a route from New Haven to the airports, a distance of approximately 90 miles, which plaintiff covers in less than two hours. Vehicles leave New Haven for Kennedy and La-Guardia on the hour from early morning until 8 p. m., stopping at Stratford, Bridgeport and Fairfield, and serving Hamden and North Haven by connecting service. This operation is tied in once in the morning and once in the afternoon with an operation serving Waterbury and Derby. The on-the-hour departures from New Haven are also continued as on-the-half-hour departures from Norwalk, and in addition plaintiff offers service originating in Norwalk on the hour, serving Darien, Stamford and Greenwich. Plaintiff also operates a service from Danbury, Ridgefield, Wilton, and New Canaan, connecting with the Norwalk and New Haven runs at Darien. In addition, service is offered approximately every two hours from New Haven, Stratford, Bridgeport, Fairfield, Darien, Norwalk, Stamford and Greenwich to the Newark Airport. And, of course, there are trips from the airports to Connecticut. There are two aspects of the return operation worth noting: (1) there are scheduled departure times, approximately every hour on the hour, but in addition there are trips in between the scheduled trips, with the limousines departing as they are filled, as often as every fifteen minutes when the traffic is heavy; and (2) the points which are served are determined by the needs of the passengers being carried.

Generally, the operation involves the simultaneous departure of two limousines from New Haven, the vehicles "leap-frogging" on movement to the airports so as to reduce the number of stops each limousine is required to make. The flexibility of the operation allows cars from different Connecticut points to meet at the Freedom Land area in New York (a service depot for plaintiff) and sort out passengers according to destination, eliminating the need for each vehicle to stop at each airport. The same sort of rendezvous may take place on trips from the airports to Connecticut.

Plaintiff bases its application on the contention that its substantial growth has created a need for the use of larger vehicles in its operations. It has represented to the Commission that if the restriction on its operations were removed, it would use 39-passenger buses together with limousines, that the buses would be equipped with lavatories, and that serious consideration is being given to having hostesses on the buses. Plaintiff proposes to operate two buses, making four daily round trips between New Haven and the airports, at times when its greatest volume of traffic is being carried. The contention is that such operation would, as to each of the four trips, eliminate the operation of three limousines. (Plaintiff would in the future, apparently, further substitute buses for limousines where justified by traffic, although the total elimination of limousines is not contemplated.)

■ The question before the Commission, under 49 U.S.C. § 307, was whether the proposed service is, or will be, required by the public convenience and necessity. One method of proving such a requirement is the use of public witnesses to show that the new service will be responsive to a public demand and need, cannot be served as well by existing carriers, and will not endanger or impair the operations of existing carriers contrary to the public interest. See, e. g., Pan American Bus Lines Operation, 1 M.C.C. 190, 203 (1936). But this method is not exclusive.

■ Public convenience and necessity may also be shown in cases such as this, by proof of operating economies or improved services, and this was the type of showing which plaintiff attempted to make before the Commission. In Salem Transp. Co., Inc., Petition to Amend Authority, 100 M.C.C. 373, 377 (1966),

Appeal Pending, the Commission said with reference to this type of showing:

> The essential requirements in these cases are that there be an existing, authorized service and that the modification sought will not permit the rendition of a new competitive service or a service substantially different from the existing service. If a new or substantially different service could result, the adequacy of existing services of opposing carriers is a basic factor to be considered and proof of operating economy or improved service alone consistently has been held to be insufficient to sustain the burden of proving the existence of public convenience and necessity. * * *

The Commission in this case gave two reasons for denying plaintiff's application: (1) the modification sought would permit the rendition of a substantially different service (citing the Salem case); and (2) the plaintiff had failed to show that the use of buses would result in operating economies or improved service.

██ The function of the Court in reviewing the Commission's action in a case such as this is, of course, quite restricted. If there is warrant in the facts and the law for what the Commission has done, that is all that is necessary, for the Commission's judgment is then to be controlling. United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821 (1946); see also Bradley v. United States, 268 F. Supp. 871, 875–876 (D.Conn.1967). On the record before us the plaintiff's action must fail, because the Commission's order finds support in both of the reasons advanced.

(1) The hearing examiner appears to have mis-stated somewhat the opinion in Salem, but that is not fatal to his reasoning. In Salem, the Commission was concerned not only with whether there would be a new competitive or substantially different service, but also with the probable effect of the new service on competing carriers. In changing Salem's eight-passenger restriction to an eleven-passenger one, the Commission was careful to point out that there would be no significant diversion of traffic from the opposing carriers. The dichotomy between mere competition and actual diversion of traffic is, of course, a false one, for in situations like these there is always some diversion of traffic (that is what competition is), and the question is merely how much, i. e., to what degree are the carriers competitive? Here, the examiner isn't really concerned with competition at all—he had no need even to rely on Salem and the cases there cited. The crux of the reasoning in this case is in the following language:

> [R]emoval of the 11-passenger limitation would place [Connecticut Limousine] in position and permit it to conduct conventional bus operations to the extent of its authority otherwise. It is not inconceivable that the use of buses could, in time, result in a disintegration of its present service to the extent that applicant would be performing operations more in the nature of the usual bus service to the detriment of what was in effect authorized as a flexible, expedited limousine service. [Emphasis in original]

██ The focus of the Commission's concern in this case is the possibility that a needed public service will be abandoned. This concern is a perfectly sound reason for denying an application, even where the Commission thinks that a showing of operating economies or "improved service" has been made. Plaintiff is distressed at the emphasis placed on the mere possibility of an abandonment of its present service; it insists that it would never use buses to the exclusion of limousines. But that misses the point, for so long as the Commission regulates in this area by means of limiting the number of passengers to be carried, it must look as what can be done under a certificate, rather than at what the applicant says will be done.

██ Plaintiff argues that if the Commission is going to deny applications for the removal of passenger restrictions

on the ground that the removal may result in rendition of a new or substantially different service, it must proceed under its rule-making power to establish subclassifications within the motor carrier classification, see 49 U.S.C. § 304(b), which it has not done. Plaintiff relies on the definition of a "rule" in the Administrative Procedure Act, 5 U.S.C. § 551(4) as "the whole or a part of any agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy * * *" But the fact that the Commission could have established the specific policy enunciated in this case under its rule-making power doesn't mean that it *must* have done so. The choice between proceeding by rule and by ad hoc litigation lies primarily in the informed discretion of the administrative agency. SEC v. Chenery Corp., 332 U.S. 194, 202–203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). There is no problem in this case of retroactive application of a new rule, with attendant penalties, to a situation where a different rule has been relied on. See N.L.R.B. v. Majestic Weaving Co., 355 F.2d 854, 860–861 (2 Cir. 1966). Moreover, the question of public convenience and necessity would seem to depend in each case upon a somewhat unique combination of circumstances, and thus to require freedom of action by the Commission which might be unduly confined by the making of too many rules of general applicability. Compare the language of the Supreme Court in I.C.C. v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 1492, 89 L.Ed. 2051 (1945):

> Public convenience and necessity is not defined by the statute * * * The purpose of Congress was to leave to the Commission authoritatively to decide whether additional motor service would serve public convenience and necessity * * * This, of course, gives administrative discretion to the Commission * * * to draw its conclusion from the infinite variety of circumstances which may occur in specific instances.

(2) Plaintiff's attempt to show that the use of buses would result in (a) operating economies or (b) improved service can only be described as niggardly.

(a) With respect to alleged operating economies, the hearing examiner pointed out that there was no estimate shown as to value of savings over any given period of time. There was only a contention that the use of a bus would replace three limousines with resultant savings to the extent buses are used. Plaintiff seems to rely for the most part on its contention that its wage costs would be lower, but even as to that the evidence is quite sketchy. Plaintiff assumed that a bus driver would be paid the same amount as a limousine driver, without any real inquiry. There was no showing as to the cost of the proposed hostesses. Moreover, the evidence, overall, is so vague that the Commission was entirely justified in concluding that the necessary showing hadn't been made.

(b) The hearing examiner pointed out a number of differences between plaintiff's present operation and the proposed operation using buses at peak hours: a passenger wouldn't know in advance whether he was to be carried by limousine or bus; plaintiff would have to employ a more extensive shuttle service with buses, meaning additional transfers between vehicles; a bus would have to stop at both LaGuardia and Kennedy; plaintiff might well experience significant loading problems at Kennedy with buses (the state of the evidence on this question is particularly confused); and passengers Connecticut-bound from Kennedy would sometimes have to wait an hour for a bus to depart, whereas with limousines there is a vehicle departing every fifteen minutes at peak hours (there is evidence that this frequent departure is highly desirable from the point of view of in-bound passengers.) On the basis of these differences, the hearing examiner thought that "the use of buses would not appear to offer, on the whole, an improved service to the traveling public. Rather it is to be feared that the

utilization of ordinary buses would impair the adequacy of applicant's present limousine service to the traveling public's detriment."

Plaintiff contends that lavatories, individual seats, and hostesses would be operating improvements. But there is no commitment by plaintiff to the use of hostesses, and the Commission thought that lavatories and individual seats were outweighed by the factors cited by the hearing examiner.

With respect to hour-long waits at Kennedy for buses to depart, plaintiff contends that it wouldn't allow delays such as would affect its business adversely. But plaintiff is not in a free market —its passengers may or may not have somewhere else to go, and the question is therefore public convenience, rather than how many customers plaintiff might lose.

Plaintiff argues that it may keep only one vehicle parked for ten minutes to expedite loading at Kennedy, and that with more than one limousine, this presents problems. Plaintiff also asserts that when more than eleven passengers arrive at the loading point, a number must wait for another vehicle, for only eleven may board at a time; this would be improved with a bus, it is argued, for all passengers could wait in the bus until it was fully loaded or until the scheduled departure. There is more than one inconsistency here, the most blatant being: what became of the ten-minute limitation? There is no evidence as to whether passengers arrive at the terminal evenly spaced or in large groups; the fact that eleven-passenger vehicles depart every fifteen minutes at peak hours indicates that there is no real loading problem with limousines, although there may be a parking problem.

Plaintiff argues that it is arbitrary for the Commission to grant a certificate to Connecticut-New York Airport Bus Company (Connecticut-New York Airport Bus Co., Inc., Common Carrier Application No. MC–126916) while denying one to plaintiff. The possibility that plaintiff's present service might disappear if plaintiff's application were granted is a sufficient answer to that argument. Moreover, the grant of such authority, recommended in a proceeding on an application by the bus company, but not yet final at the time of argument here, is still open to review in that proceeding, and may more properly be attacked there. And if plaintiff can make a more sufficient showing, on facts developed since the hearing on the instant application, it is open to it to proceed anew before the Commission.

The foregoing may serve as findings of fact and conclusions of law under Fed. R.Civ.Proc. 52(a).

The order of the Commission is affirmed.

The action to set aside or annul the order of the Commission is dismissed.